# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

JANE DOE,

    c/o Law Offices of Peter C. Hansen, LLC
1725 I Street, N.W., Suite 300
Washington, D.C. 20006

        *Plaintiff*,

    v.

MICHAEL R. POMPEO, SECRETARY, U.S. DEPARTMENT OF STATE,

    2201 C Street, N.W.
Washington, D.C. 20520,

        *Defendant*.

Case: 1:20−cv−03597 JURY DEMAND
Assigned To : Boasberg, James E.
Assign. Date : 12/10/2020
Description: Employ. Discrim. (H−DECK)

 Civil Action No.

## COMPLAINT
## (for Discrimination in Violation of the Civil Rights Act of 1964 and the Rehabilitation Act of 1973)

1.      Plaintiff Jane Doe (a pseudonym) ("Plaintiff") brings this action against Michael R. Pompeo, Secretary, U.S. Department of State ("Defendant" or "Agency") for violations of: (1) Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended ("Title VII"); and (2) Section 501 of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, as amended ("Rehabilitation Act").

## PARTIES

2.      Plaintiff, a Foreign Service Officer ("FSO") at the Agency, is a citizen of the United States and a resident of Virginia.



RECEIVED

DEC  - 9 2020

Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

3.     Defendant Michael E. Pompeo is the United States Secretary of State. He is being sued in his official capacity.

## JURISDICTION AND VENUE

4.     The Court has jurisdiction over this action pursuant to 42 U.S.C. §§ 2005e–5(f), 2000e–16(c) and 12117(a), and 29 U.S.C. §§ 794a(a), 1331.

5.     This Court may assert jurisdiction over Defendant Secretary Pompeo as head of the Agency, which is located in Washington, D.C.

6.     Venue in this Court is appropriate under 28 U.S.C. § 1391. The Agency, which is located in Washington, D.C., engaged in unlawful discriminatory conduct against Plaintiff on the bases of her race, color, sex, and perceived disability, and in reprisal for reporting and opposing discrimination, and it illegally and improperly sought, collected, reviewed, and disseminated her confidential medical information. Moreover, the State Department Office of Civil Rights ("OCR"), which endorsed the Agency's illegal conduct against Plaintiff, is located in Washington, D.C. Thus, "a substantial part of the events or omissions giving rise to the claim occurred" within this jurisdiction.

## FACTUAL ALLEGATIONS

7.     Plaintiff was employed by the Agency as a FSO, FP-04 & 05. From May 2014 to October 2015, she was assigned to the Ciudad Juárez, Mexico U.S. Consulate. Beginning in or around November 2015, she was assigned to Washington, D.C. from August 2017 to July 2019, she was assigned to the Toronto, Canada U.S. Consulate.

8.     In 2016 and 2017, Plaintiff filed multiple Freedom of Information Act ("FOIA") and Privacy Act ("PA") requests with the Agency.

2

9.     Beginning on or about October 26, 2018, the Agency began releasing to Plaintiff redacted disclosures in response to her 2016 and 2017 FOIA and PA requests. Upon her prompt review of the more than 2000 pages of disclosures, Plaintiff discovered that the Agency had: illegally and improperly investigated her history of being a victim of both sexual assault and excessive use of force by law enforcement officials stemming from a medical emergency; illegally and improperly investigated her status for filing a grievance that was subject to appeal before the Foreign Service Grievance Board ("FSGB"); and retaliated against her for opposing discrimination and for filing a grievance. With these discoveries, Plaintiff realized she had been subjected to discrimination on the bases of her race (African-American), color (black), sex (female), and perceived disability (mental and physical), and in reprisal for opposing discrimination, and she also learned that the Agency had repeatedly and illegally sought, collected, and disseminated her confidential medical information.

10.    Beginning on or about July 19, 2011, as part of DS's initial security-clearance background check of Plaintiff, DS investigators Daryl Watkins, Jack McCorckle, Ronald Comerford, and others carried out an illegal investigation into her being a victim of sexual assault earlier in 2011. While uncomfortable and upset at the time, Plaintiff assumed that DS was just doing its job and following proper procedures. However, as she discovered beginning on or about October 26, 2018 while reviewing the FOIA/PA disclosures, Mr. Watkins recorded his prejudiced impressions of his interactions with Plaintiff in her security file, notes which show that DS investigated the sexual assault on the basis that she refused to tell DS that she was a witness in her own sexual assault case.

11.     As part of the same background check investigation, and as revealed by the FOIA/PA disclosures, Mr. Watkins illegally requested and obtained Plaintiff's sexual assault disclosure from law enforcement authorities in a state in the northeastern part of the United States ("NE State"), and Mr. McCorckle illegally requested and obtained her sexual assault disclosure from her university in a state in the southeastern part of the United States ("SE State"). Plaintiff never answered "yes" to Question 21 on her Questionnaire for National Security Positions ("SF-86"), and thus she never gave anyone permission to access any of her personal records (medical or otherwise) concerning the sexual assault against her which were held by schools she attended or by law enforcement entities.

12.     Based on the information illegally sought and obtained during the background investigation, Messrs. Watkins, McCorckle, and Comerford falsely and impermissibly recorded in Plaintiff's security file that the circumstances surrounding her history as a victim of sexual assault presented issues of "personal conduct" and "emotional, mental, personality disorder." Additional prejudicial comments included: (1) "The Personal Conduct box E checked because [Plaintiff] did not tell DS she was a witness in her own assault case"; and (2) "[T]his rape would make [Plaintiff] vulnerable to coercion, exploitation, and duress."

13.     The FOIA/PA disclosures also show that Messrs. Watkins, McCorckle, and Comerford falsely reported in Plaintiff's security file that she did not voice any objections during the background check interview when she was asked about the sexual assault. On the contrary, she objected throughout the entire interview due to her discomfort with being forced to relive her trauma, and she also asked Mr. Watkins to leave the room multiple times. Mr. Watkins also falsely

reported that Plaintiff named as a reference the detective who handled her initial report of sexual assault, even though she did not name any references related to her sexual assault.

14.     In September 2012, Plaintiff suffered a medical incident and sought emergency assistance from law enforcement in NE State. Rather than responding to her medical emergency with aid, however, law enforcement personnel reacted with excessive force. As required by applicable regulations, Plaintiff reported the incident to DS and submitted the required documentation.

15.     Beginning in January 2014, DS investigator Michael Viggiano began carrying out a second security-clearance background check investigation on Plaintiff's history of being a victim of sexual assault, an investigation that was conducted under the supervision and direction of then Director of DS/Special Investigations/Personnel Security and Suitability ("DS/SI/PSS") Douglas P. Quiram, then Chief of DS/PSS/Adverse Actions Paul Hollenbeck, and PSS specialist Yvette Torres. Similar to the initial security-clearance background check in 2011, Plaintiff assumed DS was following proper procedures, and she did not suspect that the investigation was motivated or tainted by discrimination until she received and reviewed the FOIA/PA disclosures on or about October 26, 2018.

16.     From August 2014 to November 2014, DS sent letters to Plaintiff seeking her consent to having her medical providers release her confidential medical information to DS as part of this second investigation into her history of being a victim of sexual assault. Plaintiff never filled out any of the forms or otherwise gave her consent to release the information. Nevertheless, and unbeknownst to her until she reviewed the FOIA/PA disclosures on or about October 26, 2018, the Agency proceeded to use information about her sexual assaults as bases for discriminating

against her because of her sex and perceived disability, and retaliating against her for refusing to be subjected to discriminatory treatment.

17.     The FOIA/PA disclosures show that DS personnel who were involved in or witnessed this second investigation, in addition to Mr. Viggiano, included: Office Management Specialists ("OMS") Heather Marken and Amy M. Stern; and Medical/Mental Health Services ("MED/MHS") Dr. Charles Filson and his assistant, OMS Ferolyn Brooks.

18.     On or about December 5, 2014, Plaintiff was seen by Dr. Filson, and on December 11, 2014, Dr. Filson cleared her conclusively of any medical or mental health concerns, whether related to her history as a victim of sexual assault or the 2012 medical incident, and he declared her fit for duty.

19.     After Dr. Filson medically cleared Plaintiff in December 2014, the Agency shifted tactics and began using her involvement in a car accident while she was stationed in Juárez in 2015 as a pretext for continuing to investigate her confidential medical history, secretly discriminate against her on the basis of perceived disability, and secretly retaliate against her for opposing discrimination. While she objected to the investigation at the time as it seemed to have no proper basis, she did not suspect discrimination until she reviewed the FOIA/PA disclosures beginning on or about October 26, 2018.

20.     The FOIA/PA disclosures show that the investigation continued at least until August 2015, and that it claimed to have found "substantiated misconduct" on the part of Plaintiff. However, the charges mentioned in the investigation's Report of Investigation, Proposal of Discipline Letter, and Security Clearance Suspension Letter described the same 2012 medical incident that Plaintiff had already been cleared of by Dr. Filson in December 2014.

21.     As revealed in the FOIA/PA Disclosures, beginning on or about August 10, 2015, DS personnel engaged in illegal, discriminatory, and retaliatory collection, review, and dissemination of Plaintiff's confidential medical information, including notes documenting conversations she had with Dr. Filson and Ms. Brooks on December 5, 2014. These actions also violated the Privacy Act, HIPAA, and the Rehabilitation Act, as well as laws and regulations governing the SF-86 and the Adjudicative Guidelines for Determining Eligibility for Access to Classified Information ("Adjudicative Guidelines"). Agency personnel who were involved in or witnessed these actions were: DS investigators Mr. Quiram, Mr. Hallenbeck, and Ms. Torres; Regional Security Officer/Deputy Secretary of State ("RSO/D") Joseph Jung, RSO Shane Dixon, Assistant Regional Security Officer ("ARSO") Clint Richards, and ARSO-Investigator ("ARSO-I") Jason Guliani; a MED/MHS representative (possibly Ms. Brooks); and Juárez consular officials Chief of Mission or Deputy to the Consul General Eric Cohan (Plaintiff's then supervisor and reviewer responsible for her performance evaluations ("EER")), Visa Chief Mike Katula, and Consul General Ian Brownlee.

22.     The FOIA/PA disclosures show that the DS officials then impermissibly used Plaintiff's confidential medical information as evidence of a disability and as a basis for suspending and then attempting to revoke her security clearance in October 2015.

23.     The FOIA/PA disclosures also show that on or about August 10, 2015, the Agency, through MED (possibly Ms. Brooks), Ms. Torres, Mr. Dixon, Mr. Brownlee, Mr. Cohan, and Mr. Richards described Plaintiff using discriminatory racial stereotypes, including characterizing her as an "angry black woman" and mischaracterizing her comments about well-publicized incidents of police brutality and about fearing for her safety during a medical emergency as dangerous or

threatening behavior. The Agency then used her comments as an additional basis for suspending and attempting to revoke her security clearance. The misinformation was then disseminated throughout the Agency and to the post Ciudad Juárez.

24.     The FOIA/PA disclosures document that Plaintiff's October 1, 2015 security clearance suspension was informed by DS and consular officials' discriminatory views about her: (1) sex, because they prejudicially considered her history of being a victim sexual assault as evidence of unfitness; (2) race and sex, because they cast her as an "angry black woman" for complaining about police officers' excessive use of force against her during the 2012 medical incident; and (3) perceived mental and/or physical disability, because they prejudicially determined—without the requisite medical expertise as required by Adjudicative Guidelines E and I and in violation of SF-86 Question 21—that Plaintiff had an "Emotional, Mental, Personality Disorder."

25.     The FOIA/PA disclosures include the paperwork underlying Plaintiff's security clearance suspension, which shows that the suspension was made at least in part because of her history of being a victim of sexual assault. The FOIA/PA disclosures also reveal that DS improperly suspended her security clearance as a disciplinary measure, rather than over national security concerns as mandated by law.

26.     The FOIA/PA disclosures show that Bill Miller, then Principal Deputy Assistant Secretary of Diplomatic Security, signed off on the security clearance suspension. Likewise, Gregory B. Starr, then head of DS, was aware of DS's illegal, discriminatory, and retaliatory investigation and security clearance suspension, and he did not act to reign it in. Similarly,

Christian J. Schurman, then DS Deputy Assistant Secretary of State and Assistant Director for International Programs, was aware of the situation but failed to act.

27.     The FOIA/PA disclosures further show that Plaintiff's supervisors took the confidential medical information and discriminatory comments into account when completing her 2016 EER. In addition, Ms. Torres attempted to gain access to Plaintiff's EERs in August 2015. Mr. Dixon and Mr. Brownlee were aware of Ms. Torres' activities in this regard.

28.     The inaccurate 2016 EER then caused a deferral of Plaintiff's tenure, denial of promotion, loss of job opportunities, and a loss of evaluative material integral to preserving and advancing her career. For example, the FOIA/PA disclosures show that after the October 1, 2015 suspension of Plaintiff's security clearance, Chris Miscigiano, who was in Human Resources/Employee Relations/ Conduct Suitability and Discipline ("HR/ER/CSD"), the office that filed the disciplinary charges against Plaintiff and coordinated with DS to suspend her security clearance, communicated with Ms. Torres in late October and November 2015 about how Plaintiff would not receive tenure.

29.     After suspending Plaintiff's security clearance, DS attempted to revoke her security clearance on the same basis, with DS noting *inter alia* Plaintiff's 2012 medical incident and her history as a victim of sexual assault.

30.     As revealed in the FOIA/PA disclosures, in or around October 2015, Elizabeth Aubin, Bureau of Western Hemisphere Affairs ("WHA") Executive Director, contacted DS based on the inflammatory information that Ms. Torres had included in the security clearance suspension letter and disseminated throughout the Agency on October 1, 2015.

31.     The FOIA/PA disclosures show that on October 29, 2015, DS/Threat Investigations and Analysis/Office of Protective Intelligence Investigations ("DS/TIA/PII"), with the help of Ms. Aubin, illegally and improperly launched a "threat assessment" investigation of Plaintiff based on the same allegations of which she had been cleared by Dr. Filson on December 10, 2014, and based on her history of being a victim of sexual assault.

32.     During this "threat assessment" investigation, Travis T. Blanton from DS also illegally and improperly obtained, or attempted to obtain, expunged information about the 2012 medical incident involving Plaintiff from law enforcement in NE State in violation of a prior Expungement Order.

33.     The FOIA/PA disclosures show that the "threat assessment" investigation was an illegal and improper *ex post* effort by DS to gather damaging information about Plaintiff to justify her security clearance suspension. This investigation was utilized as a basis to engage in further discriminatory and retaliatory conduct. For example, WHA/EX utilized the security clearance suspension letter and the investigation to deny Plaintiff work in the WHA bureau.

34.     As revealed in the FOIA/PA disclosures, on or about October 31, 2015, Mr. Blanton, without authorization or express permission, shared Plaintiff's social security number and date of birth with the Department of Defense ("DoD"), which allowed multiple other unauthorized individuals within the DoD to view her privileged medical history. (Mr. Blanton engaged in the same action on March 9, 2016 and in May 2016.) Mr. Blanton conveyed this information to the DoD in an attempt to persuade DoD to search for damaging and highly prejudicial information about Plaintiff.

35.     On December 17, 2015, Plaintiff formally challenged DS's allegations of misconduct and determination of unfitness by filing a written response with HR/EX, and on December 18, 2015, she sent a copy of her response to DS personnel Mr. Quiram, Mr. Hollenbeck, Ms. Torres, and Mr. Jung. She then submitted supplemental information to DS on December 22, 2015 seeking to compel DS to make a decision on her clearance based on the evidence DS had obtained during its investigation.

36.     The FOIA/PA disclosures show that on or about December 23, 2015, during DS's "threat assessment" investigation of Plaintiff, Ms. Torres, Mr. Blanton, and other DS officials (likely including Special Agent ("SA") Matthew Wosley) used multiple federal databases (including NCIC, CLEAR, TAVISS, and TECS) and pulled internal Diplomatic passport information without authorization or express permission to do so, in order to search for damaging information about Plaintiff and for information on the perpetrator who sexually assaulted her. During their search, Plaintiff's passport information, social security number, date of birth, and Sentri Card information were shared with various other officials throughout DS as well as with officials from the Department of Homeland Security ("DHS"), Customs and Border Protection ("CBP"), and the Federal Bureau of Investigation.

37.     The FOIA/PA disclosures reveal that on or about December 23, 2015, the Agency searched Plaintiff's social media accounts without authorization or express permission in order to find damaging information about her. DS also tracked her movements at work while she was inside the Harry S. Truman building in Washington, D.C., and tracked her actions in her private life.

38.     Plaintiff's FOIA/PA disclosures show that on or about December 29, 2015, as part of the Agency's ongoing, retaliatory investigation of Plaintiff aimed at gathering damaging

information about her, Ms. Torres—without authorization or express permission to do so—searched the federal Automated Targeting System-Passengers ("ATS-P") database to determine Plaintiff's border crossings. Ms. Torres used the database to access Plaintiff's passport information, social security number, date of birth, and Sentri Card information. She then shared the information with DHS and CBP so that another unauthorized individual could track Plaintiff's crossings into the United States. In these actions, Ms. Torres conveyed false and highly prejudicial information about Plaintiff to the other government officials in order to persuade them to search for the requested information.

39.     The FOIA/PA disclosures reveal that in response to Plaintiff's submissions to DS, DS did not reassess, much less curtail, its investigation into her alleged misconduct and unfitness for duty. Instead, DS retaliated against her by seeking incriminating information about her in order to justify its actions. These expanded efforts included: (1) searching federal databases for negative information about Plaintiff and coercing other federal agencies to do so as well; (2) illegally obtaining Plaintiff's medical records from a hospital in NE State, records which included details of her being a victim of sexual assault, as well as reviewing the records, highlighting portions that related to the sexual assaults, uploading the records into the Agency's records systems, and granting unauthorized personnel access to the records. Agency individuals who engaged in these illegal, discriminatory, and retaliatory acts against Plaintiff were Mr. Blanton, Mr. Wosley, DS/Legal Martha Lovejoy, and DS/Legal Jenna Litschewski. Mr. Blanton was the agent who illegally obtained Plaintiff's medical records from the hospital in NE State; (2) Ms. Torres implicated Mr. Wosley in these actions; and (3) the Agency lawyers who coordinated with DS/TIA/PIA in these actions were Ms. Lovejoy and Ms. Litschewski.

12

40.     As shown in the FOIA/PA disclosures, in January 2016, Mr. Blanton approached SE State with Plaintiff's release form and falsely represented that she had consented to having her records accessed.

41.     The FOIA/PA disclosures reveal that DS referred Plaintiff to MED, seeking to have MED conspire with DS's efforts to illicitly obtain Plaintiff's medical records. MED declined to participate and instead reported the illegal actions to Legal/Employment Law ("L/EMP") in February 2016.

42.     Similarly, the Agency authorized an Agency consultant, Russell "Doc" Pallera (DS CTR Clinical Psychologist), to use Plaintiff's NE State records to perform a secret, remote medical evaluation of her in 2016, even though: (1) Dr. Filson had already cleared Plaintiff of any medical issues in December 2014 and declared her fit for duty; and (2) under the Foreign Service Manual ("FAM"), the only Agency divisions permitted to make medical determinations are MED and MED/MHS.

43.     On April 26, 2016, Human Resources/Executive Office/Deputy Assistant Secretary ("HR/EX A/S DAS") Lussier delivered a decision on the investigation's Report of Investigation, dismissing two of the three charges against Plaintiff.

44.     In July 2016, Plaintiff continued her challenge of her security suspension at the FSGB.

45.     On or about July 18, 2016, the Agency commenced an investigation into Plaintiff when, based on advice from the American Foreign Service Association ("AFSA"), she reached out to former colleagues at the U.S. Consulate in Juárez to determine if they would be willing to provide any information that might be helpful to her FSGB grievance. Mr. Richards, in an effort

to find evidence of wrongdoing, immediately reported her contact with former colleagues to Mr. Hallenbeck and Ms. Torres. In addition to opening a frivolous and retaliatory investigation, DS and Juárez Consular officials including Mr. Cohan, Mr. Katula, and Katie Plona pushed for fabricated charges and evidence against Plaintiff until it was refused by computer experts at Information Resource Management ("IRM"), and then DS was forced to drop the charges.

46.     On July 25, 2016, Dion S. Wilkins searched Plaintiff's social media accounts again in an effort to find damaging information about her as part of its never-ending investigation.

47.     On November 1, 2016, Plaintiff filed a submission with the Agency's Office of Inspector General ("OIG") to complain that DS officials had illegally and improperly obtained and reviewed her medical records relating to her treatment as victim of sexual assault. At the time, Plaintiff's knowledge of DS's investigations and related actions was extremely limited, and although she objected to them via OIG, she did not suspect that they were tainted by prohibited discrimination or retaliation until the time she reviewed the FOIA/PA disclosures in late October 2018.

48.     The FOIA/PA disclosures reveal that on November 1, 2016, Plaintiff's counsel reported the many abuses she suffered to OIG, that DS was then instructed by OIG to submit an explanation for its actions by January 2017, and DS intentionally misled OIG during its inquiry, with DS Executive Director Stephen Dietz engaging in a cover up of DS's actions.

49.     On May 10, 2017, DS reinstated Plaintiff's security clearance.

50.     On March 1, 2018, the FSGB dismissed the last remaining charge against Plaintiff.

51.     On December 3, 2018, within 45 days of developing a reasonable suspicion that she had been discriminated against following her receipt and review of the FOIA/PA disclosures beginning on or about October 26, 2018, Plaintiff made initial contact with an EEO counselor.

52.     During the informal EEO complaint phase in late 2018 and early 2019, Plaintiff discussed the following allegations of discrimination with the EEO counselor that she had discovered upon reviewing the voluminous FOIA and PA disclosures:

    i.    Beginning on or about July 8, 2011, and continuing to the present, the Agency investigated Plaintiff's history of being a victim of sexual assault.

    ii.    On or about August 10, 2015, the Agency collected, reviewed, and disseminated Plaintiff's privileged medical information.

    iii.    On or about August 10, 2015, the Agency made comments about Plaintiff that were racist and sexist.

    iv.    On or about October 29, 2015, the Agency launched a "threat assessment" investigation of Plaintiff.

    v.    On or about October 31, 2015, and continuing until at least May 2016, the Agency spread false allegations, privileged medical information, and privileged personal information about Plaintiff to the Department of Defense.

    vi.    On or about December 23, 2015, the Agency searched federal databases for information related to Plaintiff.

    vii.    On or about December 23, 2015, the Agency searched Plaintiff's social media accounts.

    viii.    On or about December 29, 2015, the Agency searched the ATSP Database to determine Plaintiff's border crossings.

    ix.    On or about July 18, 2016, the Agency launched an investigation of Plaintiff following her inquiry into her Foreign Service Grievance Board grievance.

53.     On April 29, 2019, Plaintiff timely filed her formal EEO complaint ("Complaint") against the Agency detailing the numerous ways in which the Agency discriminated against her

on the bases of: (a) race (African-American), color (black), and sex (female), in violation of Title VII; (b) perceived disability (mental and physical) in violation of the Rehabilitation Act; and (c) reprisal for opposing discrimination and for prior EEO activity in violation of Title VII. Plaintiff also alleged that the Agency repeatedly sought, collected, reviewed, and disseminated her confidential medical information in violation of the Rehabilitation Act. She laid out the nine discreet allegations listed in the previous paragraph.

54.     In her Complaint, Plaintiff alleged that the discrimination, retaliation, illegal and improper handling of her confidential medical information led to unwarranted investigations of her, suspension of her Top Secret security clearance, removal from her post in Juárez, denial of a promotion, denial of tenure, biased and inaccurate 2016 EER, loss of job opportunities, and severe damage to her career, reputation, finances, and physical and mental health.

55.     On May 1, 2019, OCR acknowledged receipt of the Complaint.

56.     On June 18, 2019, in a final agency decision ("FAD"), OCR dismissed Plaintiff's Complaint.

57.     On July 17, 2019, Plaintiff filed a timely notice of appeal of the FAD with the EEOC's Office of Federal Operations ("OFO").

58.     On August 19, 2019, Plaintiff filed a timely brief in support of her appeal with OFO.

59.     On January 7, 2020, OFO denied Plaintiff's appeal and affirmed the Agency's June 18, 2019 decision to dismiss her Complaint.

60.     On February 6, 2020, Plaintiff timely filed a request for reconsideration with OFO.

61.     On February 28, 2020, OFO docketed Plaintiff's request for reconsideration.

62.     On September 10, 2020, OFO denied Plaintiff's request for reconsideration.

63.     Despite the reinstatement of Plaintiff's security clearance and dismissal of the misconduct charges against her, the fallout from the investigations and falsifications; curtailment from her post in Ciudad Juárez; collection, review, and dissemination of confidential medical information; and flawed 2016 EER continue today, as her ability to fairly compete for future assignments as a mid-level FSO remain severely damaged, her finances have been severely harmed, and the reputational and emotional toll have been disastrous.

64.     As a result of the Agency's poisoning of the well, Plaintiff is disadvantaged when bidding on mid-level assignments.[1] She is effectively locked out of her primary choice for jobs and language skills until the Agency officials responsible for harming her are held accountable and her tenure situation is resolved once and for all.

65.     The Agency's improper actions and omissions have had a cascading effect on Plaintiff's career in limiting options and impairing her opportunity to compete for tenure. She has suffered loss of opportunities to secure evaluative experience over an extended period. Without the curtailment, Plaintiff would have arrived at Ciudad Juárez in May 2014 and departed in July 2016. After home leave for one month, Arabic language training would have commenced in September 2016 to be completed in May 2017. "Pol/Econ" training would have taken place in

---

[1] Normally, if a candidate bids on a job that requires a certain language score, the language training is built into the assignment. That is why candidates bid on an out-year language program because they are taking into account the two years of language training to acquire the required score. However, there is a rule that states you must be a tenured officer to bid on this type of program. The reasoning is that HR does not want to have untenured officers in extended periods of training (i.e., two years) because they need that time to get evaluative material for tenure and promotion. Officers are tenured based on evaluative material in their file and promoted based on jobs held specifically in their cone. As for political jobs at NEA, a FSO needs a language score of 3/3. Plaintiff only has a 2/1. As an Entry-Level Officer, she was only entitled to one year of language training—which she spent in a constant battle with DS to have her security clearance restored—and she will not qualify for more language due to the restrictions of the out-year language bidding rule that requires a FSO to be tenured.

May-June 2017 before departing Amman, Jordan. After Amman, she would have bid on Iraq and served there. However, her EERs in Ciudad Juárez, and particularly the 2016 EER, are suspect. The FOIA/PA disclosures show that with the encouragement of Agency management, Plaintiff was under investigation throughout her time in Juárez. Even after her curtailment, officials from her time in Juárez sought to harm her with the insider-threat investigation and the 2016 Juárez investigation, among other ways. Even a revised EER, while warranted, would fail to sufficiently address the serious damage to her career.

66.     These career disruptions and limitations have caused severe damage to Plaintiff's professional profile. They cannot help but cause questions to be raised about her fitness and suitability, as unjustified as that is given the underlying facts and the Agency's responsibility for her predicament. She has become a less appealing candidate, and as a result her opportunities have been further narrowed.

67.     Plaintiff has suffered direct and immediate financial consequences due to her curtailment and its aftermath. One key example is her student loans. As an incentive for FSOs who serve in areas where the dangers are more pronounced, the Agency makes available what is known as the Student Loan Repayment Program ("SLRP"). It contributes to the repayment of student loans while requiring FSOs to make timely payments to qualify. At the time of Plaintiff's curtailment, she was qualified for the SLRP and making the required payments. Not only did the curtailment remove her from the SLRP, it delayed her promotion and increase in pay. The absence of housing benefits in Washington, D.C. and the onset of legal fees forced her to defer the repayment of her student loans. The deferment of payment of student loans can only take place once. As a result, the financial consequences linger to this day.

68.     Plaintiff has also lost out on five years' worth of maximum contributions to her Thrift Savings Plan (TSP) so that she can cover her increased costs due to the Agency's disruptions to her career and life plan. For example, she has incurred substantial moving and storage costs since 2015 due to the curtailment. In addition, job and tenure insecurity forced her to forego paying bills multiple times and to reduce traveling home to visit family.

69.     Plaintiff has also suffered severe intangible harm due to the Agency's actions and omissions. The constant, severe stress associated with learning that she was being targeted for discrimination, retaliation, and exploitation through constant, bogus investigations and illegal and improper prying into sensitive, confidential information impaired her very being, her interactions, and her ability to concentrate. Her unending efforts to defend herself and remediate the damage have consumed countless weekends and evenings. While Plaintiff's EERs have generally been positive, and at times excellent, they are certainly not what they would have been in the absence of what she has had to endure. Job and tenure insecurity have also seriously interfered with her ability to plan for the long term and have therefore exposed her to unnecessary, severe stress by forcing her to make drastic contingency plans. For example, Plaintiff enrolled in and completed EMT school so that she could join the U.S. Army as a medic.

70.     The emotional damage Plaintiff has suffered cannot be overstated. She has had to relive her sexual assaults countless times. As the Agency's regulations concede, "[s]exual assault has a traumatizing impact on individuals who are assaulted and a corrosive effect on the workplace." 1453 FAM 1751(a). In fact, the Agency's actions and omissions have repeatedly revictimized Plaintiff. As a victim of sexual assault, let alone a violent sexual assault, she cannot

be expected to carry on her life amidst the Agency's abuse without developing psychological and emotional scars of one form or another.

71.     Even with exoneration, the reputational damage Plaintiff faces is never ending. As is the case with any employee who becomes involved in a formal dispute with an employer, the residual damage to Plaintiff's career and reputation have been severe. She is almost certainly viewed as a problem employee for seeking redress for the Agency's abusive actions and omissions. As demonstrated by the record, malicious rumors have been spread about Plaintiff based upon unsupported allegations arising out of her time in Ciudad Juárez. For example, the WHA Executive Director, Ms. Aubin, took personal interest in the allegations against Plaintiff, particularly in terms of her being a threat. Will Plaintiff continue to be wrongly perceived by the Agency? This is yet another reason that she is entitled to have a full and fair opportunity to restore her good name and reputation.

## <u>COUNT 1</u>
### (Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended)

72.     Plaintiff realleges paragraphs "1." through "71." as if fully stated herein.

73.     Plaintiff is employed by Defendant, which is an executive agency of the federal government to which the Civil Rights Act of 1964 applies.

74.     The actions and omissions of Defendant as described in this Complaint constitute personnel actions against Plaintiff that violated the Civil Rights Act of 1964 because they were tainted by: (a) discrimination on the bases of Plaintiff's race (African-American), color (black), and sex (female); and (b) discrimination in retaliation for Plaintiff's opposition to and reporting of discrimination.

75.     As a result of the Agency's actions, Plaintiff has suffered and will continue to suffer both economic and non-economic harm.

## COUNT 2
### (Violation of Section 501 of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, as amended)

76.     Plaintiff realleges paragraphs "1." through "71." as if fully stated herein.

77.     Plaintiff is employed by Defendant, which is an executive agency of the federal government to which the Rehabilitation Act of 1973 applies.

78.     The actions and omissions of Defendant as described in this Complaint constitute personnel actions against Plaintiff that violated the Rehabilitation Act of 1973 because they: (a) were tainted by discrimination on the basis of Plaintiff's perceived mental and physical disability; and (b) failed to properly safeguard Plaintiff's confidential medical information by illegally seeking, collecting, reviewing, and disseminating it.

79.     As a result of the Agency's actions, Plaintiff has suffered and will continue to suffer both economic and non-economic harm.

## REQUEST FOR RELIEF

80.     WHEREFORE, Plaintiff respectfully requests that this Court enter Judgment in favor of Plaintiff and against Defendant and award the following relief for the violations alleged above:

> a.  A judgment finding that the Agency engaged in unlawful discrimination against Plaintiff on the bases of her race, color, sex, and perceived disability, and in retaliation for opposing and reporting discrimination, and that it illegally and

21

improperly sought, collected, reviewed, and disseminated her confidential medical information;

b.  Expungement from all U.S. Government records mentioning Plaintiff—including her DS security file, all her employee records, and all other records in the possession or control of the U.S. Government—of any references to her being the victim of sexual assault or the victim of excessive use of force by law enforcement;

c.  Expungement from all U.S. Government records mentioning Plaintiff—including her DS security file, all her employee records, and all other records in the possession or control of the U.S. Government—of any privileged medical information related to her;

d.  Placement into a position of Plaintiff's choosing commensurate with tenure;

e.  Back pay representing the difference in pay that Plaintiff would have received had Defendant not engaged the acts and omissions detailed in this Complaint;

f.  Cancellation of the 2016 EER and re-evaluation of Plaintiff's performance and competencies under a fair process not tainted by the wrongful and prejudicial investigations;

g.  Compensatory damages for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and punitive damages, in the amount of $300,000;

h.  Pre-judgment and post-judgment interest at the highest lawful rate;

i.  Attorneys' fees and costs of this action; and

j.  Any further relief that this Court deems just and appropriate.

22

## REQUEST FOR JURY TRIAL

81.     Plaintiff respectfully requests a jury trial.


Respectfully submitted,


*/s/ J. Michael King*
J. Michael King
D.C. Bar No. 988456
Law Offices of Peter C. Hansen, LLC
1725 I Street, N.W., Suite 300
Washington, D.C. 20006
Ph: (202) 349-3907
Fax: (202) 349-3915
Email: mking@peterhansenlaw.com

*Counsel for Plaintiff*


Dated: December 9, 2020